IN THE UNITED STATES DISTRICT COURT
MIDDLE DISTRICT OF FLORIDA
JACKSONVILLE DIVISION

UNITED STATES OF AMERICA

vs.                                                    CASE NO. 3:16-cr-000048-J-34JBT

REGINALD FULLWOOD
    a/k/a Reggie Fullwood

---

**DEFENDANT FULLWOOD'S MOTION TO DISMISS
AND INCORPORATED MEMORANDUM OF LAW**

**COMES NOW** the Defendant, **REGINALD FULLWOOD**, pursuant to Rule

12(b)(3)(B)(V), through counsel, to move this Honorable Court for its Order

Dismissing Counts 1 through 10 of the Indictment charging "Wire Fraud" in violation

of 18 U.S.C. § 1343.  In further elaboration and support hereof the Defendant would

show unto the Court as follows:

1.      INTRODUCTION

As the Court has previously commented and the Defendant agrees, there is no

summary judgment procedure under the Federal criminal rules.  Nonetheless, the issue

presented hereby can and should be resolved as a matter of law on the basis of the

Indictment presented as clarified by the ensuing Bill of Particulars and the Court's

1

ruling on the Defendant's Amended Motion in Limine.  As will be seen, what is alleged in Counts 1 through 10 of the Indictment are violations of two misdemeanor sections of Florida law, nothing more, nothing less.  The Government has made a creative effort to recast those alleged violations as part of a "scheme to defraud" in violation of 18 U.S.C. § 1343, but, fails to state an offense under that section of the United States Code.  This Motion is pursuant to Rule 12(b)(3)(B)(V) which has as its basis, the "failure to state an offense".

The result is an ill-fitting Federal felony instead of State misdemeanors which fit perfectly the conduct charged.  While creative, the instant Indictment stretches the boundaries of "wire fraud" beyond its admittedly elastic limits and falls short of stating a crime under Federal law.

## 2.    BASIS FOR DECISION

In light of the previous Motion practice it is no surprise that the Defendant challenges the legal sufficiency of allegations that contributors to a political campaign, having made a lawful contribution to a candidate's campaign to support his reelection, have been "defrauded" by diversion of some of the aggregate of those contributions to the candidate's personal use.  While wrongful under State law, the alleged conduct does not threaten the property interest of any contributor and therefore the contributors cannot qualify as "victims".

2

This Court has previously correctly concluded that wire fraud occurs only when "a person (1) intentionally <u>participates in a scheme or artifice to defraud another of money or property</u> and (2) uses or causes the use of …wires for the purpose of executing the scheme or artifice".  Order on Motion in Limine dated July 20, 2016, [emphasis supplied] (Doc. 39).

Although the question now seems settled, the history of this case clearly shows that the Government has at least struggled with the question of who was the "another", or victim whose property interest was threatened by the Defendant's conduct.

As we have seen, the Government's view of that element has been a moving target.  Defendant's original Motion for Bill of Particulars (Doc. 19) sought that same information and the Government responded that it was "mystified" that the Defendant would even ask. The Response alleged that the Indictment was clear that the campaign account was the "entity" the Defendant had allegedly defrauded.  United States' Response in Opposition to Defendant's Motion for Bill of Particulars filed on May 10, 2016 (Doc. 20).  The Court has previously characterized the Governments response as having "appeared to suggest" the Defendant's campaign account is the entity that was defrauded. Order on Motion in Limine dated July 20, 2016 (Doc. 39).  Respectfully, the Government did more than suggest that.  It represented that in its response.  For ease of reference, we will call that Government's Position One.

3

The Magistrate Judge made short work of the Government's "Position One" that the campaign account was an "entity" that could be defrauded and the Government's position became that both the <u>campaign account and the campaign contributors are the victims of the alleged fraud</u>. We can call that Government's Position Two.

However, in its written response to the Court's Order requiring that it furnish a Bill of Particulars, the Government took the position that the objects of the scheme to defraud were the campaign contributors and (for the first time) the Florida Department of State Division of Elections. United States' Response to Court's Order (Doc. 25). Position Three.

By the Court's Order (Doc. 39) Granting the Motion in Limine, we can now reliably conclude that the asserted "victims", alone, are the campaign contributors (Government's Position Four).

In incremental fashion, the allegations of the Indictment and the legal theory espoused thereby, have been narrowed and refined. It is now clear that the Government's theory is limited to the allegation that the contributors are the "victims" of this alleged fraud. The Government proposed two "victims" and the Court has ruled that one, the State of Florida Division of Elections, had no property interest and therefore cannot qualify for that status. Thus narrowed, the Court now has a basis on which to test the legal sufficiency of the allegations that the campaign contributors are

4

the only "victims" of that alleged fraud.  It can be so only if it can be shown that they suffered a contemplated, intended, or actual loss of property.

In a nutshell, the Indictment charges that Fullwood diverted some portion of the campaign funds to his personal use and thereafter falsely reported ostensibly legitimate expenditures to the campaign in order to cover that diversion.  If these allegations are taken as true (as they must be for purposes of this Motion) then the sufficiency of the Indictment can be tested as a matter of law.

The vulnerability of this Indictment to a pretrial Motion to Dismiss is illustrated by other examples.  For instance, had the Government ultimately elected to settle on the Florida Department of State Division of Elections as the victim, the Court could, as a matter of law, find such allegation failed to state a crime because that State agency had no property interest at issue.   In a wholly separate context, were the Government to charge an individual with possession of a controlled substance and the substance named in the Indictment was not a "controlled substance" the Court could find the Indictment defective as a matter of law.  That principle applies equally to our circumstances.

As will be seen, the campaign contributors had no property interest that was threatened by the Defendant's conduct as alleged by the Government, and, as a matter of law, there is no victim and therefore no wire fraud.

5

### 3.    ARGUMENT

The central flaw in the Government's Indictment is a misplaced assumption that the Defendant, as treasurer of his own campaign account, became "trustee" of that account by virtue of the restrictions on its use and the related disclosure requirements of Florida's Election Code identified in the Indictment. There is no authority for that proposition and it is inconsistent with Florida law.

Yet, the Government has very explicitly argued that the campaign account was in the nature of a trust account in which contributors retained a property interest that might be "defrauded", a necessary element to the crime of wire fraud. Motion for Bill of Particulars Hearing Transcript, pgs. 12-16 (Doc. 26).

Not only has that been argued explicitly in the proceeding before the Magistrate, but it inheres in the specific operative language of the Indictment itself, i.e., that the Defendant "embezzled" money from the campaign accounts. Embezzlement by definition involves the wrongful taking of something that belonged to someone else. The Magistrate questioned the use of the term embezzlement at the time of hearing and characterized it as something of a "red herring", but further refinement was not necessary to the issues before him.

Thus, the Government syllogism goes something like this:  because there are State laws confining the use of contributions to campaign purposes and related laws

6

regarding disclosures, that this creates a "trust" or fiduciary duty owed to the contributors by the candidate to follow Florida's Election law on how the money can be spent.   Hence, when the funds were converted to personal use, that deviation from the law threatened or actually harmed a property interest retained by the contributors.  As indicated, it is inconsistent with case authority and the Florida Election Code.  Florida law clearly does not create nor even imply a retained property interest by the contributor nor a fiduciary relationship or duty relating to such property interest, the breach of which involving interstate wire might be charged as "wire fraud".

The Florida Election Code, including the section cited in the Indictment, is a regulatory scheme, much like the comparable Federal Election Code, that has nothing to do with the creation of a fiduciary relationship between the candidate and the contributors.  There is nothing in Florida law that confers the right of recovery or control of contributions by a contributor once the contribution is made.  Rather, the laws are only designed to ensure disclosure so as to thereby inhibit corruption and allow the electorate to make an informed decision regarding the identity and nature of the candidate's financial backers.  See, e.g., *Ferre vs. State,* 478 So.2d 1077 (3rd DCA, 1985); *State vs. Greco,* 479 So.2d 786 (2nd DCA, 1985); See also, *Buckley vs. Valeo,* 424 U.S. 1 (1976).

Other sections of Florida's Election Code confirm that once given, the contributor loses any property interest or control over the disposition of those funds. For example, Section 106.141, Florida Statutes, allows a candidate, at her option, to dispose of any surplus funds in several different ways. The candidate can (1) return pro rata to each contributor the funds that have not been spent or obligated, (2) donate the funds to a charitable organization, (3) give not more than $25,000.00 of the funds that have been spent or obligated to political party of which she is a member, and/or, retain $20,000.00 for use in paying general office expenses.

It is true that there are disclosure requirements regarding these matters but they do not convey control to the contributors, i.e., a property interest. Rather, they are regulatory in nature, breach of which, is properly sanctioned by existing state law.

At all times, the candidate has complete and unfettered discretion over the disposition of these funds. If, for example, the candidate gave the money to a charity or cause the contributor found objectionable, the contributor would have no right to object or to seek recovery. It necessarily follows that violation of these sections of Florida campaign law does not "defraud" that contributor of any property interest because he has none. Rather, these alleged instances of "bad behavior" are just what they appear to be, violations of Florida's Election Code.

8

It is also true that these violations of Florida's Election Code were formerly subject to mail fraud prosecution under the so called "honest services" theory. Arguably, any departure from the strict requirements of the law involve a breach of the "intangible right to honest services" owed by public officers and others to the public or any identifiable group to whom was a owed a duty of "honest services".

The Defendant continues to believe the instant prosecution is a not-so-well disguised version of that theory. As we know, following the decision in *McNally vs. United States*, 483 U.S. 350 (1987) and *Skilling vs. United States*, 561 U.S. 412 (2010), prosecutions under the mail and wire fraud statutes are, with one exception, now limited to those instances where the alleged criminal conduct involved intended or actual loss of money or property by a "victim". The only remaining non-property exception is in the instance of bribes and kickbacks which constitutes "honest services fraud". *Skilling vs. United States*, 561 at 407, circumstances which are neither alleged nor involved in any way in this case.

As stated, once given, the contributor loses any property interest in the contribution. But, what if the Government were to posit the theory that the fraudulent intent was present when the contribution was solicited or received? Of course, the short answer is that is not what the Government has alleged.

9

The Government drafted the Indictment and the Defendant is constitutionally assured that he will be put to trial only on its allegations. If the Government wants to charge a different "scheme" it may do so. But, for now, there is no allegation that the Defendant "falsely" or "fraudulently" solicited contributions or received them knowing that he intended to divert some part of them to personal use.

On the contrary, no such allegation appears and in what the Defendant considers the operative language of the Indictment, he is alleged to have "embezzled" money from the campaign account regarding which he had exclusive authority and control. The Magistrate Judge questioned the use of the word "embezzled" and the Government's response was far less than clear. Motion for Bill of Particulars Hearing Transcript, pgs. 13-17 (Doc. 26). As the Magistrate Judge noted, embezzlement implies, as it does here, the wrongful taking from a trustee. If the Defendant, as a matter of law, is not a "trustee" of the property interest of the contributors, the allegation to that effect under the Indictment would be legally insufficient.

There is also a longer answer. The longer answer is longer, but thankfully the analysis is greatly assisted by the recently decided *United States vs. Takahalov,* ___ F.3d ____, 2016 WL 3683456 (11th Cir. July 11, 2016) and *United States vs. Starr*, 816 F.2d 94 (2nd Cir. 1987), upon which *Takahalov* explicitly relies.

10

Both of those cases occur in the commercial setting and have nothing to do with campaigns[1]. Thus, parts of the analysis may present more insight than others. But, the core proposition represented by each is that a "victim" is not "defrauded" where there is only deceit. As summarized in *United States vs. Starr* (explicitly adopted by *United States vs. Takahalov*) "misrepresentations amounting only to deceit are insufficient to maintain a mail or wire fraud prosecution. Indeed, the deceit must be coupled with a contemplated harm to the victim [that] affect[s] the very nature of the bargain itself. Such harm is apparent where there exists a discrepancy between benefits reasonably anticipated because of the misleading representations and the actual benefits which the defendant delivered or intended to deliver".

Again, because of their commercial nature, these cases are not an entirely comfortable fit to our circumstances. Each of the cases involve commercial transactions where the alleged "victim" received the benefit of the bargain although the bargain was induced by some false statement.

As the Court knows, in *United States vs. Takahalov* the defendant complained that the District Court failed to instruct the jury that "failure to disclosure the financial arrangements between the B-girls and the bar, in and of itself, is not sufficient to

---

1 Indeed, the Defendant has been unable to find any post-Skilling/McNally reported authority dealing with an Indictment such as presented here. This contributes to the Defendant's view, expressed earlier, that the instant Indictment is a "creative" attempt to disguise an "honest services" theory.

convict the defendant of any offense". The B-girls were eastern European women the defendants hired to pose as tourists to locate visiting businessmen and lure them into the defendants' bars and nightclubs. Although there was apparently evidence of other activity that might constitute fraud, appellant steadfastly maintained that was the extent of their involvement.

In fact, the theory of defense was that they were tricking the victims into coming to the bar posing as tourists, but, nevertheless did not commit wire fraud because the alleged victims got exactly what they ordered, i.e., absurdly expensive drinks at the bar. Thus, any lies about the B-girls' employment status did not misrepresent the value of the bargain. The Eleventh Circuit Court of Appeals agreed because the alleged "victims" did in fact, get what they bargained for, the fact of the undisclosed financial arrangements between the B-girls and the bar notwithstanding.

From its discussion, the Court distilled a "corollary" as follows: "a schemer who tricks someone to enter into a transaction has not 'schemed to defraud' so long as he does not intend to harm the person he intends to trick and this is so even if the transaction would not have occurred but for the trick. For if there is no intent to harm, there can only be a scheme to deceive, but not one to defraud".

There is an obvious difficulty in applying that principle to the election context. In times gone by, the "honest services" theory would have carried the day. But, as we

know, that theory is no longer available. Thus, in order to assess whether there was some intended harm to the "property interest" of the contributors, the Court is first presented with the question of "what is the benefit of the bargain" to a campaign contributor. There is no allegation that there is a quid pro quo or expectation of a specific action in consequence of the contribution. There is no way to describe the benefit of the bargain to the contributor in commercial or property terms. Thus, it can only be the more amorphous concept of general good to the community or to the contributor individually or to be recognized as a campaign supporter. None of those is a "property interest" as contemplated by the wire fraud statute. As suggested herein, the Indictment is ill-fitting to our circumstances, as the concept of "fraud" has evolved to require actual or intended harm to a property interest rather than "deceit" alone or compromise to some intangible right to "honest services". As the Court in *Takahalov* summarized, "if there is no intent to harm, there can only be a scheme to deceive, but not one to defraud and the harm contemplated must affect the very nature of the bargain itself."

Here, each contributor knew exactly how much money he or she was contributing and to whom the money was being given. Accordingly, there is no "intended loss" that is necessary to a "scheme to defraud". Even if as the Government

13

alleges, some portion of the money was later used ostensibly for personal expenses, the contributor nonetheless received the benefit of the bargain.

That distinction is best illustrated by reference to the *Starr* case which seems to be more in parallel with the circumstances of the case at bar. The Starrs appealed from convictions for mail and wire fraud claiming insufficiency of the Government's evidence. The Starrs operated a "letter shop business" that provided a mailing service for various clients. The clients would send unsorted, unaddressed, mailing brochures to their business in one bulk shipment. The clients themselves would calculate the postage due on the mailing based on the number of pieces to be mailed and the applicable postage rate. That sum was separately provided to the Starrs to pay the Postal Service. The Starrs were paid for sorting, labeling, packaging and handling the mailings. The fees charged were properly entered on the books as income and the funds provided for the fees to the postal service were separately provided and maintained in a separate account.

According to the Government, the fraud occurred when the Starrs concealed articles of mail with a higher postage rate inside bulk rate mailing sacks and therefore paid the United States Postal Service something less than what was actually due and less than the rate calculated by the customer. In effect, they defrauded the Postal Service of the proper rate, a theory that was not charged.

14

Importantly to our discussion, the Starrs prepared false receipt forms that were given to the post office and a second false form to be sent to the customer indicating that the legally correct postage had been paid.  Thereafter, the Starrs took the surplus funds generated by this process as income and booked it under fictitious income categories.  There was no legitimate labor function that justified the retention of customer funds.

As previously noted herein, the Court observed that "misrepresentations only amounting to deceit are insufficient to maintain a mail or wire fraud prosecution. Instead, the deceit must be coupled with a contemplated harm to the victim.  Moreover, the harm contemplated must affect the very nature of the bargain itself.  Such harm is apparent where there exists a discrepancy between benefits reasonably anticipated because of the misleading representations and the actual benefits which the defendant delivered or intended to deliver"   Again, in effect, there is no fraud where the alleged "victim" gets what they bargain for.

The Court reversed the conviction and was undisturbed by the false representations to the customer as to the amount of postage fees that were actually paid.  The Court "assumed" that the "use to which money would be put, and the concomitant expectation that it would be used for a specific purpose implicitly constituted a part of the bargain between the parties…".  However, the Court went on

15

to find that "defeated expectation alone would not affect the nature or quality of the services that was the basis of the customers' bargain." The Court concluded that it was irrelevant to the object of the contract, "namely the delivery of mail to the appropriate destination in a timely fashion".

Although in the case at bar the benefit of the bargain was not property, the principle established by the *Starr* case is nonetheless applicable. Notwithstanding any possible claim of deceit, the contributors received the benefit of the bargain and, as a matter of law, there was no actual or intended harm to any property interest.

### 4.    CONCLUSION

Whether characterized as a reaffirmance of federalism or just a return to the roots of mail fraud and then wire fraud, the *McNally* and *Skilling* cases make clear that these sections of the United States Code, including 18 U.S.C. § 1343, do not generally criminalize bad behavior or even violations of State law. With one exception not applicable here, there must be a "victim" whose property rights are threatened.

The opening paragraph in the *Takahalov* case summarizes the ground rules by which this Court's decision making should be guided:

> "The wire-fraud statute, 18 U.S.C. § 1343 does not enact as federal law the Ninth Commandment given to Moses on Sinai. For § 1343 forbids only schemes to *defraud*, not schemes to do other wicked things, e.g., schemes to lie, trick, or otherwise deceive. The difference, of course, is that deceiving does not always involve harming another person; defrauding does. That a defendant merely 'induce[d] [the victim] to enter

into [a] transaction that he otherwise would have avoided is therefore 'insufficient' to show wire fraud. *See United States v. Starr*, 816 F.2d 94, 98 (2nd Cir. 1987)."

Here, it is expected that the Government will argue that this was fraud because the contributors had the right to reasonably expect Florida Election law would be followed, including the requirement that no portion of a contribution would be used for personal business[2]. In the real world, it is highly unlikely that was a part of any contributors thought process in deciding to contribute to a campaign. Indeed, that is likely why the Government has shopped around for other "victims" and is apparently reluctant to take on the burden of proving that it was contemplated as part of the "bargain". Respectfully, the Court has to be bothered by the various versions of the "victim" that have been asserted by the Government, all but one of which have now been discarded either voluntarily or by the Court.

But, in the Defendant's view, that confuses the analysis of the question before the Court. That is, is there a property interest that is threatened or harmed? The controlling issue in that determination is whether the contributors got the benefit of their bargain. As quoted above, *Takhalov* tells us that it is not enough that the Government show that the Defendant did wicked things, lie, trick, or otherwise deceive. That is so

---

[2] As noted earlier, a Motion to Dismiss necessarily assumes the truthfulness of the allegations, something the Defendant does not hereby concede.

17

even when such actions induced the "victim" to enter into a transaction that they would have otherwise avoided. The *Starr* case is illustrative.

That is a commercial or property concept which the Defendant would suggest is impossible to apply in the instant Indictment. *Takhalov* tells us further that a "scheme to defraud only occurs if a defendant lies about the nature of the bargain itself". Further, that lie "can take two primary forms: the defendant might lie about the price (e.g., if he promises that a good costs $10 when it in fact costs $20) or he might lie about the characteristics of the good (e.g., if he promises that a gemstone is a diamond when it is in fact a cubic zirconium)".

In this election context, there is no "bargain" involving property. Contributors do not "bargain" for strict compliance with the election code or even that the Defendant would not use some portion of the campaign money for personal expense. That cannot reasonably be said to be part of the bargain.

In the final analysis, the concept of "bargain" simply has no application to our circumstance. The Government accuses the Defendant of not following the law and misleading contributors about that. That might arguably have to do with inducement, but is not part of the bargain that is so clearly required by the referenced authority. The Indictment fails to state a crime.

**RESPECTFULLY SUBMITTED** this 19th day of August, 2016.

>/s/ Robert Stuart Willis
>ROBERT STUART WILLIS
>Florida Bar No. 153152
>Attorney for Defendant
>Willis, Ferebee & Hutton
>503 East Monroe Street
>Jacksonville, Florida  32202
>Telephone:  (904) 356-0990
>Fax: (904) 353-2756
>E-mail: rwillislaw@aol.com

I CERTIFY that on August 19, 2016, I electronically filed the foregoing with the Clerk of the Court by using the CM/ECF system which will send a notice of electronic filing to United States Attorney's Office, 300 North Hogan Street, Suite 7000, Jacksonville, Florida 32202.

>/s/ Robert Stuart Willis
>ROBERT STUART WILLIS
>Florida Bar No.: 153152
>Attorney for Defendant
>Willis, Ferebee & Hutton
>503 East Monroe Street
>Jacksonville, Florida 32202
>Telephone: (904) 356-0990
>Fax: (904) 353-2756
>E-mail: rwillislaw@aol.com

19